UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE WIRELESS TELEPHONE SERVICES       :
ANTITRUST LITIGATION                    :        02 Civ. 2637 (DLC)
                                        :
This Document Relates to:               :        <u>AMENDED OPINION</u>
                                        :            <u>AND ORDER</u>
ALL ACTIONS                             :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
Scott A. Bursor
Law Offices of Scott A. Bursor
500 Seventh Avenue, 10th Floor
New York, New York 10018

Nadeem Faruqi
Lubna Faruqi
Adam R. Gonnelli
Faruqi & Faruqi, LLP
320 East 39th Street
New York, New York 10016

David Pastor
Gilman and Pastor LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906

Robert M. Bramson
Alan R. Plutzik
L. Timothy Fisher
Bramson, Plutzik, Mahler & Birkhaeuser, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598

Daniel A. Edelman
Edelman, Combs & Latturner, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL 60603

Ashish Mahendru
Mahendru, PC
1111 Bagby, Suite 2200
Houston, TX 77002

For Cingular Defendants:
Thomas G. Slater, Jr.
Douglas M. Garrou

John D. Adams
Hunton & Williams LLP
951 East Byrd Street
Richmond, Virginia 23219

Joseph J. Saltarelli
Hunton & Williams LLP
200 Park Avenue
New York, New York 10166

For AT&T Defendants:
Robert D. Kaplan
Daniel D. Rapport
Friedman Kaplan Seiler & Adelman, LLP
1633 Broadway, 46th Floor
New York, NY 10019

Michael E. Kipling
Summit Law Group, P.L.L.C.
315 E. Fifth Ave. S., Suite 1000
Seattle, WA 98104

For Sprint Defendants:
Lawrence Kill
James M. Andriola
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

For Verizon Defendants:
Reid M. Figel
Aaron M. Panner
Michael J. Guzman
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209

For T-Mobile Defendants:
Alan M. Unger
John J. Lavelle
Mark E. Walli
Sidley Austin Brown & Wood LLP
787 Seventh Avenue
New York, New York 10019

DENISE COTE, District Judge:

On February 25, 2005, the defendants in this action, the five largest carriers of wireless telephone services in the U.S. market,[1] moved for summary judgment on plaintiffs' claim that each defendant's practice of requiring customers to purchase an approved handset in order to subscribe to the defendant's wireless telephone services constitutes an unlawful tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, defendants collectively move for summary judgment on three grounds: 1) that none of them has sufficient economic power in the market for wireless services to coerce the purchase of wireless handsets, 2) that the plaintiffs have offered no evidence of anticompetitive effects in the market for wireless handsets; and 3) that the plaintiffs have supplied no evidence of antitrust damages. Four of the defendants,

---

[1] The defendants are AT&T Wireless Services, Inc.; Cellular Telephone Company; AT&T Wireless PCS, LLC; AT&T Cellular Services, Inc.; Claircom Communications Group, Inc.; and Bay Area Cellular Telephone Company (collectively, "AT&T Wireless"); Cingular Wireless LLC; Pacific Telesis Mobile Services, LLC; Southwestern Bell Mobile Systems, LLC; Texas Rsa 18 Limited Partnership; Cingular Wireless Spectrum Sub B LLC; and Corpus Christi SMSA Limited Partnership (collectively "Cingular"); Sprint Spectrum, L.P.; Wirelessco, L.P.; and Sprintcom, Inc. (collectively "Sprint"); T-Mobile USA, Inc., f/k/a VoiceStream Wireless Corporation; Omnipoint NY MTA License, LLC; Omnipoint New York D License, LLC; Omnipoint Facilities Spectrum 2 LLC; Omnipoint Boston Area DE License, LLC; Omnipoint Boston D License, LLC; VoiceStream GSM I License Co., LLC; VoiceStream GSM II, LLC; VoiceStream PCS BTA I License Corp.; VoiceStream PCS II License Corp.; Cook Inlet/VS GSM IV PCS, LLC; and Omnipoint Holdings, Inc. (collectively "T-Mobile"); and Cellco Partnership d/b/a Verizon Wireless; New York SMSA Limited Partnership d/b/a Verizon Wireless; San Antonio MTA, LP; Chicago SMSA Limited Partnership; and GTA Mobilenet of California Limited Partnership (collectively "Verizon Wireless").

Verizon Wireless, Cingular, T-Mobile, and Sprint, have also submitted separate supplemental briefs, asserting, <u>inter alia</u>, that they each are entitled to summary judgment on the ground that as a matter of law, none of them tie the sale of handsets to the sale of wireless service. Because the plaintiffs have not presented sufficient evidence to prove that any one defendant has the degree of market power necessary to sustain a tying claim or to show that any of the defendants' alleged tying arrangements has an actual adverse effect on competition in the U.S. market for wireless handsets, defendants' motion is granted.

<u>Facts</u>

The plaintiffs bring this action on behalf of themselves and other persons who have purchased cellular or Personal Communications Services ("PCS") (collectively "wireless") telephone services from the defendants from 1998 to the present. They allege that beginning in 1998, the defendants have unlawfully tied the sale of handsets to the sale of wireless services. None of the defendants manufactures handsets, but each of them purchases handsets for direct resale to consumers through their retail stores or for sale to their respective retail agents.

This summary judgment motion requires an understanding of the evolution of the wireless telephone services industry. The facts recited here are either undisputed or as shown by the plaintiffs, unless otherwise identified. A brief description of

the history of this litigation and the context for the summary
judgment motions precedes the factual recitation.

<u>Procedural History</u>

The background and procedural history of this action have
been set forth in several prior Opinions, which are incorporated
by reference.[2]  Familiarity with these Opinions is assumed, and
only the procedural history relevant to the instant motion is
described here.

On April 5, 2002, the plaintiffs in an action captioned
<u>Brook v. AT&T Cellular Servs. Inc.</u>, No. 02 Civ. 2637, filed suit
in this District, alleging that several wireless services
providers violated federal antitrust law.  On November 19, 2002,
a conference was held in the <u>Brook</u> action, at which it was agreed
that the defendants' motions to dismiss would be dismissed as
moot and that plaintiffs could amend their complaint on the
understanding that such amended pleading would essentially be the
last.  On January 9, 2003, the <u>Brook</u> plaintiffs filed an amended
complaint, which alleged that each defendant individually ties
the sale of handsets to the provision of wireless services and

---

[2] <u>See, e.g.</u>, <u>In re Wireless Tel. Servs. Antitrust Litig.</u>,
No. 02 Civ. 2637 (DLC), 2003 WL 21912603 (S.D.N.Y. Aug. 12,
2003); <u>In re Wireless Tel. Servs. Antitrust Litig.</u>, No. 02 Civ.
2637 (DLC), No. 02 Civ. 2637 (DLC), 2004 WL 764833 (S.D.N.Y. Apr.
9, 2004); <u>In re Wireless Tel. Servs. Antitrust Litig.</u>, No. 02
Civ. 2637 (DLC), 2004 WL 1087262 (S.D.N.Y. May 17, 2004); <u>In re
Wireless Tel. Servs. Antitrust Litig.</u>, No. 02 Civ. 2637 (DLC),
2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004).

that each of the five defendants monopolizes the market for
wireless handsets compatible with its wireless services.  The
defendants jointly moved to dismiss the amended complaint on
February 21, 2003.  Shortly thereafter, the Judicial Panel on
Multidistrict Litigation ("JPMDL") transferred four putative
class actions raising similar claims as Brook to this Court.

Through an August 11, 2003 Order, and with the agreement of
the parties, the Brook action and the four transferred actions
were consolidated for pretrial purposes.  The August 11 Order
noted that any action relating to the same subject matter as
these five actions would be consolidated with them and provided
that the amended complaint filed in the Brook litigation would
serve as the Consolidated Amended Class Action Complaint for all
actions "alleging antitrust claims against national wireless
services carriers and assigned to the undersigned which is
subsequently filed in or transferred to this Court."  Brook v.
AT&T Cellular Servs., Inc., Nos. 02 Civ. 2637, 03 Civ. 1712
(DLC), 03 Civ. 1713 (DLC), 03 Civ. 1714 (DLC), 03 Civ. 1715
(DLC), 2003 WL 21911123, at *1 (S.D.N.Y. Aug. 11, 2003).  The
August 11 Order further provided that the consolidated actions
would be collectively referred to as In re Wireless Telephone
Services Antitrust Litigation.  Id.

An Opinion and Order issued the subsequent day, August 12,
2003, addressed the defendants' joint motion to dismiss.  In re
Wireless, 2003 WL 21912603 ("Motion to Dismiss Opinion").  The
Motion to Dismiss Opinion dismissed all of the plaintiffs'

4

monopolization claims on the ground that the plaintiffs failed to define properly the relevant market. Id. at *9-10. In declining to dismiss the tying claim, however, the Motion to Dismiss Opinion first observed that the plaintiffs had not alleged that the defendants "engaged in a conspiracy to tie or to raise handset prices, []or that they have entered into any kind of an agreement with each other regarding bundling or handset pricing." Id. at *6. Instead, the Opinion noted, "[e]ach Defendant is alleged to have independently violated the Sherman Act by virtue of the tying arrangement of its own services and handsets." Id. Given that, the Motion to Dismiss Opinion concluded that the plaintiffs failed to state a per se tying claim as none of the defendants were alleged to "dominate the wireless service market." Id., at *7.

As the plaintiffs alleged that "each of the Defendants possesses sufficient market power such that its tying arrangement adversely affects competition in the tied market," the Motion to Dismiss Opinion held, however, that plaintiffs had sufficiently stated a tying claim under the rule of reason doctrine. Id. The Motion to Dismiss Opinion further explained that "at trial, the plaintiffs will have the burden to show that each Defendant's market power and tying arrangement had an anticompetitive impact on the handset market." Id. at *8. Plaintiffs never objected to this description of their claims, nor did they move for reconsideration of the Motion to Dismiss Opinion. Consequently,

fact discovery proceeded on the basis that plaintiffs' tying claim was separately pled against each defendant.

On July 30, 2004, with the close of fact discovery just two months away, plaintiffs moved for leave to amend their amended complaint. Plaintiffs' proposed second amended complaint included a tying claim, <u>inter alia</u>, which alleged that the defendants, both collectively and individually, have significant market power in the tying and tied product markets. Through an October 6, 2004 Opinion and Order, plaintiffs' motion for leave to amend was denied. <u>In re Wireless</u>, 2004 WL 2244502, at *1. The October 6 Opinion explained that the plaintiffs' proposed second amended complaint would "transform the lawsuit from one asserting five tying claims against each of the defendants individually to a lawsuit alleging collective action on the tying claim." <u>Id.</u> at *6. The October 6 Opinion further noted that having included conspiracy allegations in its original complaint, which they then chose to drop, the plaintiffs' decision to "reassert the conspiracy allegations they initially abandoned" could not constitute the good cause needed for "a substantial and untimely amendment" that would significantly delay the resolution of the litigation.[3] <u>Id.</u>

---

[3] On August 17, 2004, while the motion to amend was being briefed, plaintiffs' counsel, representing a separate plaintiff, also brought an action in the Northern District of California captioned <u>Freeland v. AT&T Corp.</u> The <u>Freeland</u> action, which was transferred to this Court by the JPMDL in November 2004 and is now captioned 04 Civ. 8653 (DLC), not only alleges that the defendants in this action have engaged in collective action to

Fact discovery in this action closed on October 8, 2004, and expert discovery ended on January 21, 2005. The defendants jointly moved for summary judgment on February 28, 2005, and briefing was complete on this motion, including the related motions to strike certain declarations and expert testimony, on June 17, 2005.[4]

The parties have made extensive submissions in connection with this motion and the associated motions <u>in limine</u> and motions to strike. Because of the analysis that follows, it is only essential to set forth a small portion of the factual material presented through these motions. The essential facts as shown through the evidence presented with these motions include the following.

<u>The Evolution of Wireless Services in the U.S.</u>

Wireless telephone service was first introduced in the U.S. in the early 1980s. At that time, the Federal Communications Commission ("FCC") allocated spectrum such that only two

---

tie the sale of handsets to wireless services, but also charges that by engaging in certain practices, the defendants have entered into a conspiracy to restrain trade and contracts in restraint of trade in violation of Section 1 of the Sherman Act, and a conspiracy to monopolize in violation of Section 2 of the Sherman Act. Plaintiffs' motion for an order setting a pretrial schedule in the <u>Freeland</u> action is pending, as is defendants' cross-motion to dismiss the <u>Freeland</u> action as duplicative.

[4] On February 25, 2005, the plaintiffs moved for class certification. Because of the resolution of the instant motion, it is unnecessary to rule on that motion.

companies could provide service in any given market.  Beginning
in 1995, however, the FCC auctioned new spectrum for PCS, which
ultimately consisted of more than twice the amount of spectrum
previously allocated to wireless telephone service.  The
allocation of PCS spectrum enabled as many as eight competitors
to operate within a single market.[5]  As PCS providers began
operating their networks, the number of wireless subscribers rose
from under 25 million in 1994 to 86 million in 1999.  In 2003,
over 160 million people subscribed to wireless service.

The mid-1990s increase in the amount of spectrum allocated
paralleled and enabled another significant change in the wireless
industry: the switch from analog to digital technology.  Although
the FCC had maintained a specific technological standard for
analog service, it decided not to do so for digital service.
Consequently, multiple digital technologies were introduced in
the mid-1990s, among them CDMA, which is used by Sprint and
Verizon Wireless; and GSM, which is used by T-Mobile and to which
Cingular and AT&T Wireless are in the process of converting their
networks.[6]  The parties dispute the compatibility of these
technologies.  While the defendants assert that these
technologies are mutually incompatible, the plaintiffs state that

---

[5] Since the mid-to-late 1990s, another frequency block,
referred to as SMR spectrum, has also been used for wireless
telephone services.

[6] The two other digital technologies are TDMA, which is now
obsolete and from which Cingular and AT&T Wireless are switching,
and iDEN, the technology used by non-party Nextel.

they are only incompatible to the extent that the carriers have manipulated them so as to inhibit a consumer's ability to use her wireless telephone, or handset, with multiple carriers and to heighten the costs of switching from one carrier to another.

While the defendants employ varying digital protocols, each defendant has captured similar benefits from the advent of digital service. Digital service not only expanded the types of services wireless carriers can provide, enabling, among other things, caller ID, text messaging, and e-mail, but it also eradicated some of the security problems, such as service theft and eavesdropping, associated with analog service. Most importantly, however, digital service enabled wireless service providers to accommodate more users within any given amount of spectrum, thereby reducing their need to set up additional transmitters or cell sites.

Digital technology has also wrought major changes in consumer use and the providers' revenue. In 1994, the average monthly usage per subscriber was 119 minutes. This figure rose to 185 minutes in 1999 and skyrocketed to 507 minutes by 2003. During the same time frame, the providers' average revenue per minute fell from 47 cents to 10 cents with a 66 percent drop alone from 1998 to 2003.

The Development of Handsets and How They've Changed

Because wireless service providers cannot implement more efficient service unless subscribers are using handsets that

operate on their respective networks, handsets sold for use in the U.S. wireless services market are developed by manufacturers in collaboration with the wireless service providers. The quality of handsets available to subscribers is particularly important to the service providers because the use of "outmoded" handsets not only affects the quality of that subscriber's service, but also diminishes the quality of service to other subscribers. As a result, at least two of the defendants, Verizon Wireless and AT&T Wireless, subject or have subjected handset models to an approval process involving testing and maintain a list of models approved for use with their respective services.

It is undisputed that the handset manufacturers compete with one another to offer the highest quality, maximum spectral efficiency, and lowest prices to the wireless service providers who purchase their handsets. The parties dispute, however, whether certain companies have manufactured or currently do manufacture wireless telephones, and more importantly, whether the handset market has been "dynamic" since 1999.[7] In addition, while the parties agree that certain companies, including Sony, Palm, Hewlett Packard, Danger, and RIM, have entered the U.S.

---

[7] The parties dispute which entities can appropriately be called handset manufacturers. The defendants contend that companies that develop and build handsets and then sell them under different brand names should be considered manufacturers. The plaintiffs, by contrast, argue that only the company listed as a handset's manufacturer should be considered as such.

handset market during the relevant time frame, the plaintiffs argue that these entrants collectively account for an insignificant portion of the U.S. handset market.

In 1995, just three percent of handsets sold in the U.S. were digital. By contrast, by 2000, essentially all handsets sold in the U.S. were digital. Today's digital handsets feature many improvements over their predecessors, such as enhanced battery life, smaller size and diminished weight, and a host of improved features, including automatic redial, speed dial, alarm clocks, address books, speakerphones, voice-activated dialing, and color screens. All of the defendants also currently sell handsets equipped with cameras as well as data services, such as text messaging, the downloading of ring tones, music, and games. Even as handsets have become increasingly more sophisticated, the cost of handsets has dropped.[8]

Just as the parties dispute the inherent compatibility of the various digital technologies with one another, they also dispute whether a handset designed to work on one digital network can function on another network. The plaintiff argues, for example, that certain handsets are designed to operate across

---

[8] The plaintiffs argue, by way of citation to the expert report of Nicholas Economides, that even though the wholesale prices for digital handsets have dropped since 2000, they were artificially inflated between 1999 and 2003 as a direct result of the defendants' tying arrangements. For reasons that will be described below, Economides's analysis of handset prices cannot be admitted into evidence.

multiple protocols, but that the defendants program the handsets used in conjunction with their respective service so as to prevent such usage.  In addition, the parties dispute the extent to which consumers desire the innovations now featured on handsets and disagree as to whether handsets offered in the U.S. sufficiently incorporate other emerging technologies.

The Distribution and Sale of Handsets in the U.S.

It is undisputed that since the inception of wireless service in the U.S., wireless service providers have sold their respective service and handsets as a package, and that in doing so, the carriers have subsidized the cost of handsets to make initial entry into the wireless services market "more palatable." Although wireless handsets have become much more affordable over the last fifteen years, wireless service providers continue to package service and handsets, subsidizing the latter, "to continue to open up markets and make it affordable" for consumers to obtain wireless service.

The plaintiffs allege that in an effort to prevent customers from switching carriers, each of the defendants requires that handsets sold for use with its respective network are programmed, or "locked," to prevent the use of such handsets with another carrier.[9]  The defendants deal with this assertion in varying

_____

[9] A substantial share of plaintiffs' evidentiary submissions regarding locking concerns the defendants' coordinated efforts, primarily through various wireless industry organizations, to

12

ways.  Verizon Wireless, for example, contends that it does not
lock handsets on the ground that its "post-pay"[10] handsets are
set to a widely-known default equivalent to leaving a handset
unlocked.  By contrast, T-Mobile acknowledges that since the mid-
1990s, the handsets sold for use on its network have featured
locked SIM cards, hardware chips embedded in handsets that
identify a particular user and allow her access to a specific
network.  T-Mobile contends that it employs handset locking to
prevent retailers from selling and/or activating T-Mobile-
subsidized handsets on other networks and to deter theft on the
basis that it can deactivate the SIM card of a stolen handset.[11]
T-Mobile further asserts that it has a policy of unlocking any
handset at a subscriber's request.

   The parties also dispute the extent to which the defendants'
sales of wireless service are tied to that of handsets and
whether aside from their direct handset sales, the defendants
also dominate the purchase and distribution of handsets that are
sold subsequently to consumers through other, non-carrier-owned
retail channels.  This Opinion does not reach the legal issue
most closely associated with these disputes: whether as a

---

promulgate handset locks as an industry standard by requiring
manufacturers to incorporate such locks in handsets developed for
use with their respective networks.

   [10] Verizon does not define, however, what it means by "post-
pay."

   [11] Sprint, which also admits to locking handsets, cites
similar justifications for locking.

condition of receiving wireless services from a particular defendant, consumers are required to purchase a handset from that defendant as well. Nevertheless, so as to provide a full picture of the wireless services industry, it is necessary to illustrate how the distribution and sale of handsets in the U.S. function.

The following paragraph uses Verizon Wireless, which, as of 2003, possessed the largest market share among U.S. wireless service providers and among the defendants, as an example of how the defendants sell and/or distribute handsets. Like other carriers, Verizon Wireless not only operates its own retail stores, but it also maintains agreements with more than 2,000 sales agents, which are authorized to sell its service and which independently sell handsets as well. In acquiring the handsets they sell to consumers, Verizon's sales agents "typically have the right to purchase either from Verizon Wireless or from third-party sources, provided that the handsets purchased are approved for operation on Verizon Wireless's CDMA network." Although large retailers, such as Radio Shack, often choose to purchase handsets directly from Verizon Wireless, retailers' contracts with Verizon Wireless specifically empower them to purchase equipment through non-Verizon sources, notably manufacturers or distributors, so long as such equipment has been approved by Verizon and is prepared for use on Verizon's network.[12] These

---

[12] Pursuant to an agreement with the plaintiffs, approximately one dozen contracts were produced and served as a sample. This paragraph also relies on the declaration of Thomas Bryant, an associate director for indirect distribution for

14

contracts also reflect that most covered retailers establish
handset prices without Verizon's involvement and that they have
responsibility for the installation and maintenance, as well as
warranties for, the handsets they sell.

The Changing Structure of the Wireless Industry

Since the late 1990s, the structure of the wireless services
industry has fundamentally changed.  Just as digital technology
offers certain efficiencies, so too does having a nationwide
network, which eliminates a provider's need to pay roaming costs
to other carriers.  Whereas some carriers, such as AT&T Wireless,
already had extensive geographic coverage by the late 1990s,
other, more regionally-focused carriers began to join forces to
achieve nationwide coverage.  Verizon Wireless, Cingular, and T-
Mobile, all of which now provide national coverage, each emerged
from the combination of smaller carriers in 2000.[13]  More

Verizon Wireless.  The plaintiffs have moved to strike the Bryant
declaration, inter alia, because he did not sufficiently disclose
the bases of his personal knowledge and on other grounds.  The
motion to strike is denied; the defendants have cured any
relevant deficiencies.  This Opinion determines that the
defendants are entitled to summary judgment even if they control
sales and distribution in the U.S. handset market.

[13] As the FCC related in 2004,

Verizon Wireless's national system was based on a
combination of wireless-owned systems (Bell Atlantic,
NYNEX, GTE) with those accumulated and consolidated by
Vodafone (including AirTouch).  Cingular was formed by
merging SBC's (including former SNET, PacBell, and
Ameritech) and BellSouth's systems.  T-Mobile acquired
the systems constructed and combined by VoiceStream and

15

recently, AT&T Wireless and Cingular merged in 2004, and Sprint

merged with Nextel, a non-party to this action, in 2005.[14]

Pursuant to congressional mandate, since 1995, the FCC has

reported annually on competitive conditions in the wireless

services industry.[15]  Such reports reveal the changing nature of

the wireless services industry.  According to the FCC, in 1998,

none of the five largest service providers possessed more than 11

percent of the nationwide market, and together, they comprised

only 47 percent of the market.  Since 2000, however, Verizon

Wireless has maintained a 24 percent market share, and in 2003,

the five largest wireless service providers accounted for 70

---

Omnipoint.

Mem. Op. & Order, Applications of AT&T Wireless Servs., Inc. and Cingular Wireless Corp. for Consent to Transfer Control of Licenses and Authorizations, WT Docket No. 04-70 (Oct. 26, 2004) ("AT&T/Cingular Order").

[14] Through an August 8, 2005 memorandum opinion and order, the FCC approved the merger of Sprint and Nextel.  See Mem. Op. & Order, Applications of Nextel Comm., Inc. and Sprint Corp. for Consent to Transfer Control of Licenses and Authorizations, FCC 05-148, WC Docket No. 05-63 (Aug. 8 ,2005) ("Sprint/Nextel Order").  In an August 16, 2005 letter, the defendants argue that this order, which concludes that the wireless services industry is characterized by vigorous competition and that the national service providers are each substitutes for one another, should be considered in connection with this motion.  Because the briefing of this motion was completed before the issuance of the Sprint/Nextel Order, it will not be relied upon in reaching the merits of the defendants' motions.

[15] The plaintiffs do not dispute the accuracy of the FCC's findings, but instead dispute their import, arguing that they do not address the defendants' alleged tying arrangements.

percent of the market.  The FCC reports that Verizon's market share of 24 percent is the largest in the industry; that Cingular's market share has fluctuated between 15 and 18 percent; that AT&T has held between 10 and 15 percent; that Sprint's share has never exceeded 11 percent; and that T-Mobile has never held more than 8 percent.  The FCC has also reported that as of 2004, 97 percent of the American population could choose from at least three providers that own their own network, and 87 percent of the population had a choice of at least five carriers.

In the above-referenced reports, the FCC has not only assessed the carriers' respective market shares but has also observed other indicia of competition, such as "the continued rollout of differentiated pricing plans" by different providers, which it has recognized since 2001.  In 2003, for instance, the FCC described the wireless providers as exhibiting "independent pricing behavior, in the form of continued experimentation with varying pricing levels and structures, for varying service pacakages, with various available handsets and policies on handset pricing."  The FCC has also measured how many customers each wireless service provider typically loses per month, a figure known in the industry as "churn."  Since 2000, wireless service providers have lost 1.5 to 3 percent of their customers each a month, resulting in a loss, or "churn," of between 18 and 36 percent of customers each year.

On the basis of specific findings such as these, the FCC has repeatedly described the wireless services market as competitive.

In 1999, for instance, the FCC observed "steady competitive progress" in the wireless services industry; in 2000, it found the industry continuing to benefit from "the effects of increased competition as evidenced by lower prices to consumers and increased diversity of service offerings;" in 2001 and 2002, it determined the industry featured "increased competition;" in 2003, it concluded that "effective competition" was present in the wireless services market; and in 2004, it wrote that "U.S. consumers continue to benefit greatly from robust competition in the marketplace."

In 2004, Cingular and AT&T Wireless merged, a transaction that required FCC approval and generated substantial analysis of the industry as a whole by the FCC.  In approving this merger, the FCC noted that its approval of such mergers is conditioned on a finding that it is in the public interest, which entails honoring the Communications Act's "deeply rooted preference for preserving and enhancing competition in relevant markets."  With this mandate in mind, the FCC concluded that "the nationwide firms are all relatively close substitutes for each other in the eyes of consumers and that the nationwide firms," meaning Verizon Wireless, Sprint, T-Mobile, and Nextel, "have the incentive and ability to reposition in response to any attempted exercise of

market power by the merged firm."[16]  AT&T Wireless Order at ¶
147.

## Discussion

Summary judgment may be granted only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Rule 56(c), Fed. R.
Civ. P.; see also Sec. Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).  "The burden
of showing that no genuine factual dispute exists rests on the
party seeking summary judgment, and in assessing the record to
determine whether there is a genuine issue as to a material fact,
the court is required to resolve all ambiguities and draw all
permissible factual inferences in favor of the party against whom
summary judgment is sought."  Old Dominion Freight Line, 391 F.3d
at 83 (citation omitted) (emphasis supplied).

When the moving party has asserted facts showing that it is
entitled to summary judgment, the opposing party must "set forth
specific facts showing that there is a genuine issue for trial,"
and cannot rest on the "mere allegations or denials" of the
movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; accord Burt

---

[16] Again, the plaintiffs do not challenge the FCC's findings
in the AT&T/Cingular Order but argue that the order "does not
address the issue of tying in the context of the merger."

Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).  If there is evidence, however, "from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Old Dominion Freight Line, 391 F.3d at 83 (citation omitted).

In the realm of antitrust law, "summary judgment serves a vital function," Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95 (2d Cir. 1998), by avoiding "[w]asteful trials and prolonged litigation that may have a chilling effect on procompetitive market forces."  Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 263 (2d Cir. 2001)(citation omitted).  "If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted."  Eastman Kodak Co. v. Image Tech. Serv., Inc., 544 U.S. 451, 468-69 (1992).  Nevertheless, "[n]o special burden is imposed on a plaintiff opposing summary judgment in an antitrust case."  Virgin Atlantic, 257 F.3d at 262 (citation omitted).

I.  Legal Framework

A.  Elements of Tying

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15

U.S.C. § 1.  The Sherman Act exists "to protect competition, not individual competitors."  <u>Virgin Atlantic</u>, 257 F.3d at 265.

Among the activities prohibited by Section 1 are restraints of trade in the form of "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  <u>Eastman Kodak</u>, 504 U.S. at 461 (citation omitted); <u>see also</u> Edward M. Iacobucci, <u>Tying as Quality Control: A Legal and Economic Analysis</u>, 32 J. Legal Stud. 435, 435 (2003).  Such agreements are known as tying arrangements.  Courts have repeatedly emphasized that

> the essential characteristic of an invalid tying
> arrangement lies in the seller's exploitation of its
> control over the tying product to force the buyer into
> the purchase of the tied product that the buyer either
> did not want at all, or might have preferred to
> purchase elsewhere on different terms.

<u>Hack v. President and Fellows of Yale College</u>, 237 F.3d 81, 85 (2d Cir. 2000) (citing <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12 (1984)).

When a consumer is forced to purchase a tied product when the consumer would not do so in a competitive market, a tying arrangement is unlawful.  <u>See</u> <u>Jefferson Parish</u>, 466 U.S. at 13-14.  In essence, a seller may not use its market power in one market "to impair competition on the merits in another market."  <u>Id.</u> at 14.  Competition in the tied market can be impaired by injuring existing businesses in the market or creating barriers to entering the market.  <u>Id.</u>  The consumer is injured when her

freedom to select the best bargain is impaired by her need to purchase the tying product.  Id. at 15.  She may also be injured when she is unable to evaluate the true cost of either product when they are only available as a package.  Id.

Both before and after the Supreme Court's 1984 decision in Jefferson Parish, which is viewed as one of the Court's most significant decisions on Sherman Act tying claims, the Second Circuit has required proof of five specific elements to state an unlawful tying claim:

> first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of interstate commerce in the tied market.

Hack, 237 F.3d at 86; see also DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996); Gonzalez v. St. Margaret's House Housing Dev. Fund Corp., 880 F.2d 1514, 1516-17 (2d Cir. 1989); Yentsch v. Texaco, Inc., 630 F.2d 46, 56 (2d Cir. 1980).


B.    The Per Se Rule of Tying

As the Supreme Court has repeatedly held, "certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'"  Jefferson Parish, 466 U.S. at 9.  Analysis under the per se rule is, by definition, "without inquiry into actual market conditions."  Id. at 15.  Put another way, where a tying arrangement may be condemned as

illegal per se, plaintiffs need not allege, let alone prove,
facts addressed to the fourth element.  In re Visa
Check/Mastermoney Antitrust Litig., 280 F.3d 124, 133 n.5 (2d
Cir. 2001); In re Wireless, 2003 WL 21912603, at *4-5.  If a
plaintiff succeeds in establishing the existence of sufficient
market power to create a per se violation, the plaintiff is also
relieved of the burden of rebutting any justifications the
defendant may offer for the tie.

A tying arrangement may be condemned as illegal per se only
"if the existence of forcing is probable" because there is a
"substantial potential for impact on competition."  Jefferson
Parish, 466 U.S. at 15-16.  While the Supreme Court has never
defined how much market power is necessary to condemn a tying
arrangement as illegal per se, the Jefferson Parish Court
concluded that a thirty percent market share was "far from
overwhelming" and did "not establish the kind of dominant market
position" that entitles a plaintiff to a finding that the tying
arrangement is per se illegal.  Id. at 26-27.


C.   The Rule of Reason
Where the plaintiff has alleged a tying violation, and the
showing of market power is insufficient to find a per se
violation of antitrust law, courts apply a rule of reason
analysis at the fact-finding stage through a burden-shifting
scheme.  In re Wireless Tel. Servs., 2003 WL 21912603, at *5, 7.
Specifically, the plaintiffs "bear an initial burden to

demonstrate the defendants' challenged behavior had an <u>actual</u>
adverse effect on competition as a whole in the [tied product]
market." <u>Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.</u>, 386 F.3d
485, 506-07 (2d Cir. 2004) (citation omitted) (emphasis in
original); <u>see also</u> <u>In re Visa Check</u>, 280 F.3d at 134 n.5.

"[W]hether an actual adverse effect has occurred is
determined by examining factors like reduced output, increased
prices and decreased quality." <u>Virgin Atlantic</u>, 257 F.3d at 264.
So too may a demonstration of "significant barriers to entry into
[a particular] market" show an actual adverse effect on
competition. <u>CDC Techs., Inc. v. Idexx Labs., Inc.</u>, 186 F.3d 74,
80 (2d Cir. 1999). If the plaintiff fulfills this preliminary
burden, however, "the burden shifts to the defendants to offer
evidence of the pro-competitive effects of their agreement."
<u>Geneva Pharm Tech. Corp.</u>, 386 F.3d at 507 (citation omitted).
"Assuming defendants can provide such proof, the burden shifts
back to the plaintiffs to prove that any legitimate competitive
benefits offered by defendants could have been achieved through
less restrictive means." <u>Id.</u> (citation omitted).


D. Market Power in a Rule of Reason Case

The third element of a tying claim -- market power in the
tying product market -- requires that the plaintiff prove that
the defendant has "the power to force a purchaser to do something
that he would not do in a competitive market," which is often

equated with "the ability of a single seller to raise price and restrict output." Eastman Kodak, 504 U.S. at 464 (citation omitted). A seller's market power "ordinarily is inferred from [its] possession of a predominant share of the market." Id. Nevertheless, market power may also exist in other circumstances, such as where "the government has granted the seller a patent or similar monopoly over a product," Jefferson Parish, 466 U.S. at 16, or "when the seller offers a unique product that competitors are not able to offer." Id. at 17.

As noted above, the Second Circuit requires proof of market power in all tying cases. As the Court observed in Jefferson Parish, "[w]ithout evidence that [defendants] are using market power to force" consumers to purchase the product or service in the tied market, "there is no basis to view the arrangement as unreasonably restraining competition." Jefferson Parish, 466 U.S. at 24 n.40. This is so, because "only if" consumers "are forced to purchase" the tied product "as a result of [the defendants'] market power would the arrangement have anticompetitive consequences." Id. at 25. In her concurrence in Jefferson Parish, Justice O'Connor emphasized the centrality of a market power analysis for tying claims even as she argued that it was time to abandon the per se label for a class of tying claims.[17] She recommended reducing all analysis of tying claims

_____

[17] While continuing to list proof of market power as an essential component of a tying claim, the Second Circuit has not yet addressed the ramifications of the Jefferson Parish majority

25

to a three-part inquiry, the first element of which would be an unqualified requirement that the seller have "power in the tying product market." Id. at 35, 38 (O'Connor, J., concurring).[18]  As the Honorable Frank H. Easterbrook has written in connection with his analysis of a tying claim,

> Antitrust law is based on the premise that when markets are competitive, the process of sellers' rivalry and buyers' choice produces the best results.  Unless courts insist on a showing of market power, they run the risk of deleting one of the existing options and so reducing rather than enhancing the vigor of competition and the welfare of consumers.

Will v. Comprehensive Accounting Corp., 776 F.2d 665, 673-74 (7th Cir. 1985).

Since Jefferson Parish, most Circuit Courts of Appeals have explicitly insisted on a showing of market power for a plaintiff to succeed on a tying claim.  The Sixth and Seventh Circuits have adopted the three-step analysis proposed by Justice O'Connor, including the threshold requirement of a showing of market power

---

and concurring opinions in any detail.  In Gonzalez, the sole occasion on which our Circuit has even commented on the divergence between the Jefferson Parish majority and Justice O'Connor's concurrence, the Honorable Wilfred Feinberg observed that despite "weaknesses in the per se tying analysis," the court was obligated to "adhere to the views of a majority of the Supreme Court, which has not abandoned the per se test." Gonzalez, 880 F.2d at 1519.

[18] In adopting Justice O'Connor's framework for analysis of all tying claims, the Sixth Circuit noted that in Eastman Kodak, 504 U.S. at 451, issued eight years after Jefferson Parish, 466 U.S. at 2, the majority opinion did not even mention the terms per se or rule of reason.  PSI, 104 F.3d at 815 n.2.

for all tying claims.  <u>See PSI Repair Servs., Inc. v. Honeywell,</u> <u>Inc.</u>, 104 F.3d 811, 815 n.2, 821 (6th Cir. 1997) (affirming summary judgment for defendant for plaintiff's failure to show market power in tying product market); <u>Hardy v. City Optical</u> <u>Inc.</u>, 39 F.3d 765, 767 (7th Cir. 1994) (per curiam) (reinstating lawsuit with admonition that district court must find a 30 percent market share at a minimum); <u>Hand v. Cent. Transport,</u> <u>Inc.</u>, 779 F.2d 8, 11 (6th Cir. 1985) (reinstating lawsuit for failure to consider evidence of market power in a submarket); <u>Will</u>, 776 F.2d at 673-74 (reversing a jury verdict on a tying claim for a failure to prove defendant had market power).  Thus, as the Honorable Richard A. Posner explained in <u>Hardy</u>, since "substantial market power is a threshold requirement of all rule of reason" cases in these Circuits, a tying arrangement is not illegal "unless the defendant has substantial market power in the tying product."  <u>Hardy</u>, 39 F.3d at 767.

Other circuits have disclaimed the requirement of market power for a rule of reason tying claim, but have imported such a requirement through other means.  The Third Circuit, for instance, has explained on one hand that <u>Jefferson Parish</u> has foreclosed it from requiring a plaintiff to prove the existence of market power in the tying market under a rule of reason analysis, <u>Town Sound</u>, 959 F.2d at 485, yet it imposes an equivalent burden on a plaintiff by requiring a showing of a "plausible theory of causation of injury of the type the antitrust laws were designed to prevent," <u>id</u>. at 486 (citation

omitted).  The Third Circuit also observes that an antitrust

tying claim "falls apart" where a defendant lacks sufficient

power in the tying product market to leverage power in the tied

product market.  Id.  But see Grappone, 858 F.2d at 798-99

(proceeding to analyze anti- and pro-competitive effects of the

tie after finding that plaintiff had not shown existence of

market power in the tying market).[19]

The law regarding what constitutes sufficient market power

to create an illegal tie is still developing.  Consistent with

Jefferson Parish, both the Sixth and Seventh Circuits, however,

have opined that thirty percent serves as the minimum market

share from which the market power in the tying product market can

be inferred.  Hardy, 39 F.3d at 767; PSI Repair Servs., 104 F.3d

at 815 n.2, 818.  In Town Sound, the Third Circuit acknowledged

the thirty percent threshold and found that Chrysler's share of

10 to 12 percent of the United States car market did not create

---

[19] Despite the repeated emphasis of the Jefferson Parish
Court on the importance of proof of market power to a tying
claim, some courts have fixated on the fact that, after finding
that the defendant did not have sufficient market power to
warrant application of a per se tying analysis, the Court
proceeded to analyze the claim without further discussion of the
defendant's market power.  Having already accepted that the
defendant had a 30 percent market share, 466 U.S. at 26, a number
it characterized as "far from overwhelming," id., there was no
obvious need for the Court to discuss the defendant's market
power further.  When the entire Jefferson Parish decision is
read, and even more so when it is read with the other decisions
that comprise the Court's tying jurisprudence, it is obvious that
proof of market power remains a critical component of a tying
claim.

"any genuine issue of material fact" as to its "economic power" in that market.  <u>Town Sound</u>, 959 F.2d at 481.

II. Defendants' Motion for Summary Judgment: Market Power

Defendants move for summary judgment on the ground that the plaintiffs have not presented evidence raising a question of fact that any one of the defendants had sufficient power in the market for wireless service to "force" consumers, within the meaning of the federal antitrust laws, to purchase unwanted handsets.  The defendants are correct.

None of the defendants enjoys a market share that would, standing alone, permit an inference of market power to be drawn, and the plaintiffs have not shown that questions of fact exist with respect to any other issue which, when combined with a defendant's market share, would allow a finding of market power. Between 1998 and 2003, no defendant has ever possessed more than twenty-four percent of the wireless services market.[20]  At the end of 1998, when plaintiffs allege that each of the defendants (or their predecessors) first tied their service to the purchase of

_____

[20] Defendants acknowledge that Cingular and AT&T Wireless's combined market share in 2003 was 29 percent.  Cingular and AT&T Wireless did not even announce, much less complete, their merger until 2004.  Given that the defendants assert that the plaintiffs' tying claims target the period 1998 through 2003, and the plaintiffs do not contest that they and their experts have relied entirely on data from this period to support their tying claims and to estimate their purported damages, it is not necessary to contemplate Cingular's post-merger market share.

handsets, the largest wireless service provider carried no more than eleven percent of subscribers.  The defendants compete against each other in terms of service and price, and the high churn rate is striking evidence of their respective lack of control over the market and the impediments each of them faces to any effort to control price.

The plaintiffs acknowledge that vigorous competition exists in the wireless services market and that to succeed on a tying claim that they must show that a defendant holds market power, but urge that they need make "only a minimal showing of market power," citing <u>Northern Pac. R. Co. v. United States</u>, 356 U.S. 1, 6, 7-8, 11 (1958).[21]  <u>Northern Pacific</u> provides no comfort to the plaintiffs.

In <u>Northern Pacific</u>, the Court upheld an injunction issued against the Northern Pacific Railway Company that barred it from enforcing or entering into preferential routing clauses.  The railroad had received forty million acres of land in several northwestern states and territories to facilitate its construction of a railroad line, and had sold or leased most of this land.  Most of the sales contracts and lease agreements

---

[21] In denying the motion to dismiss the tying claim, this Court noted that the precise amount of market power necessary to prevail on a tying claim remains an open question, citing a footnote in Justice O'Connor's concurrence in <u>Jefferson Parish</u> in which she also described <u>Northern Pacific</u> as requiring "only a minimal showing of market power."  <u>In re Wireless</u>, 2003 WL 21912603, at *7.

contained a preferential routing clause that required the purchaser or lessee to ship all commodities produced or manufactured on that land over its railroad.  For a large portion of these shipments there were two other major competing railroad systems.  _Id_. at 517.  The Court defined the illegality involved in tying as forcing buyers to forego their free choice.  _Id_. at 518.  It observed, "[o]f course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most."  _Id_. at 519.  It found that the railroad "possessed substantial economic power by virtue of its extensive land holdings which it used as leverage."  _Id_.

_Northern Pacific_, which was written fifty years ago, is entirely consistent with the standards described earlier in this Opinion.  As more cases have reached the appellate courts, the law regarding what constitutes "sufficient economic power to impose an appreciable restraint," _id_. at 521, has become better defined.  While the precise amount remains an open question, it has become clear that possession of a 30 percent market share is the minimum sufficient by itself to confer market power.  Although _Northern Pacific_ did not undertake to define the precise market affected by the railroad's land holdings, or to compute the percentage of its holdings in that market, it nonetheless

found the railroad to possess substantial power over a finite but infinitely valuable resource.

The plaintiffs next contend that market shares of less than 30 percent have been found sufficient to create market power in tying cases, citing Rosebrough Monument Co. v. Memorial Park Cemetary Assn., 666 F.2d 1130, 1143 (8th Cir. 1981), as finding that 22 percent was sufficient to invoke the per se rule against tying; Visa Check, 2003 WL 1712568, at *4-5, as finding that 26 to 28 percent was sufficient to raise a triable issue on market power for a per se tying claim; and United States v. Visa, 163 F. Supp. 2d at 363, as finding that a 26 percent market share established market power.  As Rosebrough Monument predates Jefferson Parish, its conclusion that the defendants' combined 22 percent market share confers upon them a "unique economic advantage" has negligible force.  Rosebrough Monument, 666 F.2d at 1143.

In addition, neither Visa Check nor Visa suggests that a 30 percent market share should not be the presumptive line for inferring market power.  The Visa Check case centered on a claim by several of the nation's largest retailers that Visa and Mastercard "require[d] stores accepting [their] credit cards to also accept their debit cards."  In re Visa Check/Mastermoney Antitrust Litig., 129 F.R.D. 68, 71 (E.D.N.Y. 2000).  The Honorable John Gleeson denied the plaintiffs' motion for summary

judgment on their Section 1 _per se_ tying claim.  _Visa Check_, 2003
WL 1712568, at *6.  In doing so, Judge Gleeson observed that the
tying product market could be defined "at its broadest" as the
market for "general purpose credit and charge card services."
_Visa Check_, 2003 WL 1712568, at *3.  At the same time, however,
Judge Gleeson observed that the relevant evidence suggested "an
even narrower product market" consisting of "general purpose
credit card services alone."  _Id._  Therefore, Judge Gleeson
assessed MasterCard's share of two alternative markets: the
broader market, in which MasterCard's share fluctuated between 26
to 28 percent over the relevant time period, and the more
narrowly-defined market, in which it share "varied from between
33 to 36 percent."  _Id._ at *4.[22]  Judge Gleeson was asked solely
to decide whether those figures were sufficient to impose _per se_
liability, and found that he could not, at that stage of the
proceeding, conclude as a matter of law that "MasterCard has
sufficient economic power to warrant application of the _per se_
rule."  _Id._ (citation omitted).

The _Visa_ case, which does not involve a tying claim, is no
more availing for the plaintiffs.  In that case, the Honorable
Barbara S. Jones determined that Visa and MasterCard had market
power primarily on the basis of direct evidence demonstrating

---

[22] Visa's share of the more broadly defined market was 43 to
47 percent, and was nearly 60 percent of the narrower market.

their "power to control prices or exclude competition" and their "ability to price discriminate." <u>Visa</u>, 163 F. Supp. 2d at 340 (citation omitted).  Specifically, Judge Jones noted plaintiffs' evidentiary showing that they could not refuse to accept Visa and MasterCard "even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." <u>Id.</u>  Judge Jones further recognized that both defendants had "raised interchange rates charged to merchants" several times "without losing a single customer" and that they were able to charge "substantially different prices" to different categories of merchants because of customers' insistence on using their cards. <u>Id.</u>  Moreover, with respect to the defendants' market share, Judge Jones found that together Visa and MasterCard controlled over 73 percent of the relevant market in terms of transactions and 85 percent in terms of cards issued, with Visa responsible for 47 percent and MasterCard responsible for 26 percent. <u>Id.</u> at 341.  Judge Jones found that market power could be presumed in the presence of these numbers because there were "significant enough barriers to entry or expansion that the defendant can charge supracompetitive prices without loss of so many customers that the pricing becomes unprofitable." <u>Id.</u>  The court did not assert that a 26 percent market share always equals market power but instead provided that market power may be

34

presumed where, as in both Visa and MasterCard's cases, the firm has a "large share in a highly concentrated market with significant barriers to entry."  Id. at 342.

The plaintiffs next assert that the wireless market is an oligopoly with six nationwide carriers during most of the class period, and that individual businesses in an oligopoly "may" in some circumstances have market power.  The plaintiffs identify the following special circumstances as creating market power here:  product differentiation, meaning the creation of products understood by consumers to be "distinct commodities;" the need to obtain FCC spectrum licensing, which presents an "absolute" barrier to new entrants into the wireless service market; and each defendant's control of its own retail handset network.  The plaintiffs have not presented evidence to raise a question of fact as to whether any of these alleged factors has created market power for any one of the defendants.

If by product differentiation, the plaintiffs are referring to the efforts that each defendant has made to brand its product, then the plaintiffs have not shown as either a matter of law or fact that the creation of a brand has conferred market power on a defendant.  "A single branded product may, in rare cases, constitute its own relevant market." U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 998 (11th Cir. 1993) (citation omitted).  "[E]ntrenched buyer preferences for established

brands" can also create significant barriers to entry.  Rebel Oil
Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1439 (9th Cir.
1995).  Yet the mere existence of a brand and brand
identification in the marketplace are not synonymous with market
power.  See, e.g., Grappone, 858 F.2d at 797 (consumer preference
for branded product alone cannot demonstrate market power).  In
general, where "interbrand competition exists . . . it provides a
significant check on the exploitation of interbrand market power
because of the ability of consumers to substitute a different
brand of the same product."  Cont'l T.V., Inc. v. GTE Sylvania,
Inc., 433 U.S. 36, 52 n.19.

The plaintiffs have failed to offer any evidence that
branding has created market power for any of the defendants.
Instead, they merely cite the testimony of defendants' expert,
Jerry Hausman, who testified that products in the wireless
services industry "are differentiated to some extent."  The
enormous amount of churn in this industry eviscerates the
suggestion that consumers do not view these brands and the
services underlying them as essentially interchangeable.  The FCC
found, in approving the Cingular/AT&T Wireless merger in 2004,
that the defendants, along with non-parties that offer nationwide
coverage "are all relatively close substitutes for each other in
the eyes of consumers."  AT&T/Cingular Order at ¶ 147.

Holding an FCC license for a portion of the spectrum does not confer market power on any one of the defendants since each of them, as well as others not named here as defendants, have FCC licenses. Moreover, not only may licensees buy and sell spectrum with the FCC's consent, but to compete with the defendants, a seller of wireless services does not even need an FCC spectrum license, as the growth of the mobile virtual network operator[23] system has shown. As a result, no defendant is specially advantaged <u>vis a vis</u> its competitors in this industry because of spectrum licensing. To the extent that the plaintiffs analogize a spectrum license to a patent, that analogy is flawed. A patent confers advantages on one party <u>vis a vis</u> its competitors; here, each of the defendants has the same advantage of holding a spectrum license.

The fact that each defendant has or had a network of retail distributors of its service and approved telephones is not evidence of market power within the relevant market of wireless service. Since each defendant sells its service to the public in this way, no one defendant has any special advantage or power by its use of a retail network. To the extent that the plaintiffs use this factor as evidence of the anti-competitive effects of the tying practice that they assert exist within the tied market

---

[23] A mobile virtual network operator orders handsets from a large handset manufacturer and resells network capacity leased at wholesale rates from a major wireless service provider.

of handsets, that will be discussed below.  In sum, it is
unnecessary to decide if the wireless service market can be
properly labeled an oligopoly.[24]  The plaintiffs have not
presented evidence to raise a question of fact that any of the
features of this alleged oligopoly on which they place special
emphasis has actually conferred market power on any one of the
defendants.

In a related argument, the plaintiffs contend that the
structure of the wireless services market, in particular the
defendants' parallel actions, serves as evidence of their
respective market power in the services market, citing <u>Broadway</u>
<u>Delivery Corp. v. United Parcel Serv. of Am., Inc.</u>, 651 F.2d 122,
129 (2d Cir. 1981).  <u>Broadway Delivery</u> addressed the issue of
market power in the context of a monopoly claim, not a tying
claim.  The portion of <u>Broadway Delivery</u> on which plaintiffs rely
deals with whether a jury should have been charged that a
defendant's share of less than fifty percent of a market
automatically ruled out a finding of monopoly power under Section

---

[24] An oligopoly is defined as "control or domination of a
market by a few large sellers, creating high prices and low
output similar to those found in a monopoly."  <u>Black's Law</u>
<u>Dictionary</u> 1120 (8th ed. 2004).  To the extent that the
plaintiffs are using their reference to oligopoly to reposition
their tying claim as a conspiracy claim, that effort fails.  The
plaintiffs abandoned their conspiracy claim long ago and it would
prejudice the defendants at this late stage to allow a
reformulation in this consolidated lawsuit of plaintiffs' legal
theories.

2 of the Sherman Act.  Id. at 127.  Noting that market share data serves as "strong, perhaps presumptive, evidence of the presence or absence of market power," id. at 128 (citation omitted), the Broadway Delivery court nonetheless cautioned that "careful analysis" of market share, and the structure of the market, including the activities of the defendant and others within the market, was necessary to ascertain whether a defendant had monopoly power.  Id. at 128-29.  At no point did Broadway Delivery identify parallel actions of market participants as evidence that the defendant had market power.  As already described, the structure of the wireless services market reflects intense competition with no single, dominant seller.

Turning more directly to the plaintiff's argument about parallel conduct, although liability may be imposed on the basis of conscious parallelism in certain antitrust contexts, see, e.g., Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001) (horizontal price-fixing agreement), our Circuit's tying case law lends no support for an inference of market power to be drawn from defendants' parallel behavior.  Indeed, unless the plaintiff has alleged a conspiracy, it is inappropriate to assess one defendant's market power by measuring "the cumulative power of all defendants practicing tying."  10 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1734e, at 49 (2d ed. 2004) [hereinafter Antitrust Law].

As the Motion to Dismiss Opinion explained, having elected not to proceed on a theory of conspiracy in their Amended Complaint, the plaintiffs must demonstrate that each defendant individually has market power. <u>In re Wireless</u>, 2003 WL 21912603, at *8. While the plaintiffs had originally brought a conspiracy claim in this lawsuit, they dropped that claim from their Amended Complaint. <u>In re Wireless</u>, 2004 WL 2244502, at *6. The plaintiffs may not circumvent that history by framing defendants' allegedly parallel actions as evidence of their respective market power.

The plaintiffs next contend that market power exists because the defendants face a "downward sloping demand" curve, that is, that each of the defendants has the power to raise prices somewhat without losing all sales. The test for market power is not whether a defendant can raise its prices somewhat, but whether the defendant has the power to control prices or exclude competition. <u>See</u> <u>Visa</u>, 344 F.3d at 239; <u>CDC Techs.</u>, 186 F.3d at 81 (defining market power as "the ability to raise price significantly above the competitive level without losing all of one's business").

In a related argument, the plaintiffs assert that each of the defendants, even those with the smallest market share, has independent market power because each of them sets the price for

its services above marginal cost.[25]  While the plaintiffs assume

that an estimate of marginal cost, made by an expert for the

defendants[26] and based on operational and financial data provided

by AIRtouch, applies to all defendants and at the same time

overstates defendants' current marginal costs, they have offered

no actual data on any one of the defendants' costs nor have they

provided any expert analysis of the import of such costs to

market power.[27]  In fact, the defendants' expert, on whose

estimate the plaintiffs rely for this argument, specifically

---

[25] Marginal cost is defined as "the additional cost incurred in producing one more unit of output."  Black's Law Dictionary 372 (8th ed. 2004).

[26] In their opposition brief, the plaintiffs solely rely on testimony of defendants' expert Jerry Hausman in which he agreed that every defendant prices above marginal cost.  Through their Rule 56.1 Statement, plaintiffs also note, however, that in a 2000 academic article, Hausman estimated the marginal cost of providing wireless services to be 5 cents per minute.  They further note that at his deposition, Hausman acknowledged that "it's quite likely" that the marginal cost of service has declined since then.

[27] The plaintiffs' brief in opposition to this motion creates an argument based on the Lerner Index.  Specifically, the plaintiffs note Hausman's expert report states, using data from a 2004 FCC report, that average revenue per minute, often used as a proxy for price, was 29 cents per minute in 1998 and 10 cents per minute in 2003.  Using Hausman's academic estimate of marginal cost and these estimates of prices, the plaintiffs have computed a Lerner Index of .85 for 1998 and .5 for 2003.  The plaintiffs, however, have presented no expert report regarding the significance of that Index in this case, and in particular its implications for a conclusion that any defendant had market power.  See United States v. Eastman Kodak, 63 F.3d 95, 109 (2d Cir. 1995) (rejecting use of Lerner Index as a measure of market power where defendant is not the "seller of a differentiated product that sets prices independently of its rivals").

testified that he did not undertake to determine the carriers'
marginal costs for the purposes of this case.

In order to show market power from a defendant's practice of
selling its products above marginal cost, a plaintiff must
accurately measure price and all appropriate costs. See Menasha
Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 665 (7th
Cir. 2004) (rejecting plaintiff's claim that defendant
consistently sold its product for more than marginal cost without
evidence that the defendant obtained an unusually high return on
capital). Moreover, the test for the existence of market power
is the ability to control price or exclude competition, Visa, 344
F.3d at 239, not simply pricing a product above marginal cost
when that price differential can be explained by the existence of
economic realities entirely separate from the existence of market
power, for instance, the presence of high fixed costs. See
Eastman Kodak, 63 F.3d at 109 ("Certain deviations between
marginal cost and price, such as those resulting from high fixed
costs, are not evidence of market power.") Here, it is
undisputed that the defendants' fixed costs include the
transmission network, towers, and fiber optic cable. In such
circumstances, marginal cost cannot serve as the "competitive
benchmark;" rather, all market participants will price above
marginal cost to cover fixed costs.

The plaintiffs contend that the existence of market power can be inferred from the fact that each defendant imposes burdensome terms on consumers, specifically, term contracts with early termination and activation fees.  A defendant's use of such contracts does not create an inference supporting a finding of market power, since each of the defendants (as well as service providers who are not defendants) offer service through similar contracts.[28]  Therefore, the use of term contracts cannot be said to exclude competition.  Nor have plaintiffs alleged, much less demonstrated, that any defendant's use of term contracts, evidences an ability to control prices.

Finally, the plaintiffs contend that it is fair to infer the existence of market power from the fact that competition has been harmed in the handset market.  Some courts have stated that market power may be proven through "direct evidence of anticompetitive effects."  Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000) (affirming FTC finding that company's vertical restraints violated the rule of reason under 15 U.S.C. § 5).  In Toys "R" Us, the company's boycott succeeded in causing ten major toy manufacturers to reduce output of toys to warehouse

---

[28] The defendants explain that term contracts help carriers recover customer acquisition costs and allow them to charge lower prices and to subsidize handsets in the hope that they will be able to recover the investment.  There is no need to address the merits of this argument since the plaintiffs have failed to raise a question of fact that term contracts either create or reflect market power by any one defendant.

clubs, which protected the company from having to lower its
prices.  Id.  Even assuming that market power can be shown in a
tying case through the inference created by providing direct
evidence of anticompetitive effect, as will be discussed below,
the plaintiffs have failed to provide any such direct evidence.
Because the plaintiffs have been unable to show that any one of
the defendants has market power in the wireless services
industry, each of the defendants is entitled to summary judgment
on the plaintiffs' claim that each of the defendants violated the
Sherman Act by forcing consumers to purchase handsets to receive
service.

II.  Defendants' Motion for Summary Judgment: Anticompetitive
     Effects

     Defendants have also moved for summary judgment on the
alternative ground that the plaintiffs have not shown that each
defendant's alleged tying arrangements has an anticompetitive
effect on the handset market.  At the outset, the
interrelationship between market power and anticompetitive
effects merits some exposition.

     Given that market power and anticompetitive effects serve as
separate elements of a tying violation, courts are not always
explicit about the interaction between these two concepts.
Nevertheless, the Supreme Court has long recognized the

interrelationship between market power and anticompetitive effects. Indeed, at the heart of the _per se_ rule of tying is the intuition that where a seller has significant market power, one may "presum[e] unreasonableness without the necessity of any analysis of the market context in which the [alleged tying] arrangement may be found." Jefferson Parish, 466 U.S. at 9. As a consequence, where a defendant's market power is sufficiently great that its tie qualifies as a _per se_ violation, a plaintiff is relieved of the separate burden of showing an anticompetitive effect from the tying in the tied product market. Conversely, the tying case law also reflects the understanding that where market power is not present, an alleged tying violation cannot be a threat to competition in the tied product market. As Justice O'Connor observed in her concurrence in Jefferson Parish, a "seller must have power in the tying product market. Absent such power, tying cannot conceivably have any adverse impact in the tied product market and can only be pro-competitive in the tying product market." Id. at 37 (O'Connor, J., concurring).

Even courts that have declined to demand expressly a showing of market power under the rule of reason understand the interplay between market power and anticompetitive effects. As the Third Circuit explained in Town Sound, in which the plaintiffs challenged the legality of tying autosound systems to the sale of Chrysler automobiles,

> [e]ven if we assumed that soon _every_ automobile
> manufacturer will include an autosound system on _every_
> car, the most that we could conclude would be that a
> certain class of competitors (namely the autosound
> aftermarket dealers) might be doomed to competitive
> oblivion.  But that would be no concern of the
> antitrust laws unless consumers were also hurt because
> of diminished competition.  If the autosound
> aftermarket were to disappear, vigorous competition in
> the automobile market would remain.  That competition
> would protect those consumers who care about autosound
> systems no less than it now protects consumers who care
> about other standard features, including the comfort of
> the front seats, the quality of the brakes, and the
> fuel efficiency of the engine.

Town Sound, 959 F.2d at 494 n.40 (citation omitted).  Put another

way, the Town Sound court understood that in a tying product

market characterized by competition, even if all market

participants engage in packaged sales, such conduct cannot have

actual anticompetitive effects in the tied product market.  Thus,

having been unable to show that any of the defendants has market

power, it is not surprising that plaintiffs are also unable to

show that the tying practice in which each defendant is alleged

to have engaged has resulted in any anticompetitive effects in

the handset market.

To demonstrate anticompetitive effects, a plaintiff must

demonstrate that the tie "as it actually operates in the market"

harmed competition in the tied product market.  Jefferson Parish,

466 U.S. at 29.  For a tie to create an anticompetitive effect

there must be "a substantial threat that the tying seller will

acquire market power in the tied product market.  No such threat

46

exists if the tied product market is occupied by many stable sellers who are not likely to be driven out by tying, or if entry barriers in the tied product market are low." Id. at 38 (O'Connor, J., concurring). "Speculation about anticompetitive effects is not enough." Roy B. Taylor Sales, Inc. v. Hollymatic Corp., 28 F.3d 1379, 1385 (5th Cir. 1994). At no time may "expert testimony rooted in hypothetical assumptions . . . substitute for actual market data." Virgin Airways, 257 F.3d at 264.

In their complaint, the plaintiffs allege that the defendants' alleged tying arrangements have driven numerous handset manufacturers from the market, have deterred entry into the handset market, and have had deleterious effects on the development of handset technology. In re Wireless, 2003 WL 21912605, at *9. The plaintiffs have not offered sufficient evidence from which a jury could find that any one of those phenomena has occurred.

The plaintiffs first contend in opposition to this motion that each defendant has foreclosed manufacturers from entering the handset market by leveraging "its control of its spectrum licenses and its wireless network to exercise gatekeeping control over a significant portion of the retail market for handsets." Ordinarily, if one were making a foreclosure argument, one would expect the plaintiffs to present a detailed picture of the

history of the handset market in the United States, with the
number of manufacturers in the market each year, and evidence of
failed efforts to enter.[29]  The plaintiffs have not done so,
opting instead to rely entirely on sweeping generalizations and
vague opinions rather than facts.  For instance, citing the
testimony of Kyocera's representative, who estimated that there
are "somewhere between 50 and 100 manufacturers in the wireless
handset space" worldwide, but that most of the defendants only
"do business"[30] with between three to six manufacturers, the

---

[29] The plaintiffs have devoted some attention to creating a
historical picture of the handset market.  For instance, to
demonstrate how the handset market has changed since the
evolution of digital service, the plaintiffs cite the testimony
of Peter Skarzynski, a former employee of AT&T Wireless's
consumer products division.  According to Skarzynski, during his
1994 through 1997 tenure at AT&T, the consumer products division
not only sold handsets to retailers such as Sears and Best Buy
"without the involvement of the carrier," but such handsets
"could be purchased by consumers and then activated with the
service of a carrier of the consumer's choice."  In a similar
vein, the plaintiffs rely on the testimony of their expert,
Robert Zicker, who stated that during the analog age, "the
technologies were all compatible and an attempt to limit [a
consumer's] source of handsets wouldn't be too effective" as the
retailers had "a multitude of different places they could buy
handsets from."  Yet without any showing that manufacturers were
precluded from the U.S. handset market as of the time that the
defendants' alleged tying practices were imposed or since, such
historical reflection has little relevance.

[30] While the plaintiffs repeatedly argue that a manufacturer
must have a "business relationship" with a carrier in order to
sell handsets in the U.S., they have failed to define precisely
what such a business relationship entails.  In some instances,
the plaintiffs' conception of "doing business" seems to mean a
carrier's purchasing a certain manufacturer's handsets.  At other
times, however, the plaintiffs suggest that a manufacturer's
doing business with a carrier involves "working with carriers to

plaintiffs contend that the number of handset manufacturers operating in the United States is controlled and limited as a function of defendants' conduct. Yet Kyocera's representative also testified that a number of new manufacturers are entering the U.S. handset market not by selling to the carriers, but instead by selling through a distributor or by developing, manufacturing, and then selling its products "to somebody like Audiovox or Motorola or Nokia or Kyocera Wireless," which then sells the product under its own brand name. Rather than discouraging manufacturers to enter the handset market, Kyocera's representative further testified that where a new entrant has developed an interesting product, a wireless service provider may encourage it to "find one of [its] existing suppliers" to get the product on the market.

The plaintiffs also cite the expert report of Nicholas Economides, an economics professor at New York University's Stern School of Business, who asserts that the carriers "requir[e] that all handset sales flow through the carrier's distribution system if they are to be used in the carrier's network," and that "the manufacturers' only customers are the carriers." Economides's

---

put out a product that matches their requirements." At no point have the plaintiffs explicitly argued, much less proven, that any defendant's control over which handsets will be approved for use with its respective network has actually foreclosed manufacturers from the market for handset sales in the U.S.

support for this argument, however, derives solely from the

testimony of LG's representative, who confirmed that "all of LG's

sales of GSM handsets in the United States are funneled through

GSM carriers;"[31] from the testimony of Kyocera's representative,

who credited the carriers with "put[ting] our product out there;"

and from that of a Samsung representative, who explained that

Samsung had a commercial arrangement with a U.S. carrier before

making any handset sales in the U.S. market and that he "d[id]n't

really know of any manufacturer who doesn't sell through carriers

today."  Such testimony hardly establishes, as Economides

contends, that <u>all</u> handset sales flow through carriers'

distribution systems.

Yet even if the plaintiffs could establish that all handset

sales flow through the carriers' distribution systems,[32] the fact

that the defendants are not handset manufacturers themselves but

instead purchase handsets from others has "ameliorating

implications."  10 <u>Antitrust Law</u> ¶1727e, at 310.  As Professors

---

[31] The same LG representative also testified that LG's entry
into the market was "tough but not impossible" and that the
packaged sales of handsets and service "helps," rather than
hinders, LG's business because "[y]ou can't run the product
without service.  It has to run on a network."

[32] There is evidence that directly contradicts the
plaintiffs' contention that all handset sales flow through the
carriers' distribution system.  For example, some manufacturers,
such as Kyocera, do directly sell handsets through their website
and are "more than happy to sell the phone without a [service]
plan."

Areeda and Hovenkamp have explained, using the example of an oil refiner that purchases tires and then resells them to its dealers, "[t]he refiner who buys tires cannot acquire power for itself in the market for manufacturing tires. While the tie forecloses tire makers from selling to defendant's dealers, tire makers can compete as vigorously as ever in seeking the defendant's patronage." Id. So too can manufacturers compete vigorously in the U.S. handset market for the patronage of the carriers, even if the plaintiffs were able to show that the carriers' conduct prevents manufacturers from selling directly to retailers or other distributors.

More significantly, even if the plaintiffs could show that no manufacturer in the U.S. handset market has made direct-to-consumer sales since 1999, such evidence in or itself does not demonstrate that any manufacturer has been precluded from gaining entry to the handset market or that consumers have been adversely affected. See S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc., 138 F.3d 869, 877 (11th Cir. 1998). Most manufacturers of consumer products, such as those sold in grocery, drug, or department stores, choose to sell their products through distribution channels. Handset manufacturers are no different. As LG's representative testified, while LG has never sold handsets directly to consumers either before or after 1998, "[t]here's nothing that would stop" it from selling handsets

directly to consumers in the United States.  Rather, after considering the "resources and infrastructure" a direct sales-based business model would require, LG simply "chose[] not to support any type of [direct] handset sales."  To find that such a choice is not a choice at all but instead proves an anticompetitive impact defies logic.

The plaintiffs' reliance on the April 16, 2002 edition of The Yankee Group Research Notes, a telecommunications-related publication to which defendants' expert Keith Mallinson contributed, is equally unavailing.  According to the plaintiffs, Mallinson's piece, entitled "Mobile Phone Manufacturers Develop Brand and Diversify Distribution," establishes the gatekeeping role played by each defendant with respect to handset distribution.  The plaintiffs have selectively quoted from this article.  While Mallinson described the U.S. market for handsets as characterized by "carrier dominated distribution," he also argued that the emergence of CDMA and GSM as the dominant technologies increased manufacturers' market power vis a vis carriers and that handset vendors should "leverag[e] their brands by reaching out directly to consumers" and "by partnering with third-party distributors."  Even if, as Mallinson explained, "alternative channels [of distribution] are unlikely to take the lead in the United States," if manufacturers were truly being

"held hostage" by the carriers, as the plaintiffs argue, such alternatives would not even be feasible.

The plaintiffs next argue that defendants' tying practices have resulted in increased handset prices. To support this contention, plaintiffs rely solely on Economides's report, which features a regression analysis that purports to show that the defendants' tying and locking of handsets inflated the average wholesale price of handsets between 1999 through 2003 relative to that of other, comparable consumer electronic goods.[33] The defendants have moved, pursuant to Rules 401, 402, and 702, Fed. R. Evid., for an order in limine to exclude Economides's report as unreliable. The defendants argue, inter alia, that Economides's report must be excluded because in conducting his regression analysis, he failed to consider or test for any alternative explanations for the inflation in handset prices. The defendants further argue that Economides's regression analysis, as well as his report as a whole, fails to address the effects of each defendant's alleged tying arrangements and instead impermissibly measures the aggregate effects of the defendants' practices.

---

[33] Multiple regression analysis is a commonly accepted statistical tool used to examine "the effect of independent variables on a dependent variable." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999). The parties do not dispute that the retail and wholesale prices for digital handsets have declined annually since the year 2000. The plaintiffs argue, however, that the decline would have been greater but for tying.

Rule 702 of the Federal Rules of Evidence provides that expert testimony concerning technical or specialized knowledge is admissible to assist the trier of fact if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702, Fed. R. Evid. A court has an obligation to act as a gatekeeper to ensure the "reliability and relevancy of expert testimony" presented to a jury. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999); <u>see also</u> <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 594-95 (1993) (overarching subject of inquiry under Rule 702 is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission). Specifically, the court must determine that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho</u>, 526 U.S. at 152.

Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant. In <u>Bickerstaff</u>, the Second Circuit affirmed a district court's exclusion of the Title VII plaintiff's expert's multiple regression analysis, which controlled for experience, rank, productivity, and discipline to conclude that a salary variance was attributable to

54

discrimination, but did not control for such "nondiscriminatory causes" as teaching and service. <u>Bickerstaff</u>, 196 F.3d at 448-49. While noting that in general, an expert's "failure to include variables will affect the analysis' probativeness, not its admissibility," the <u>Bickerstaff</u> court determined that the analysis at issue was "so incomplete as to be inadmissible as irrelevant." <u>Id.</u> at 449 (citation omitted).

The defendants are correct that Economides's regression analysis is methodologically unsound and therefore may not be admitted pursuant to Rule 702. In performing his regression analysis, Economides used United States International Trade Commission ("USITC") data on the declared value of imported handsets as a measure of the average wholesale price of handsets in the U.S. and then performed linear regressions of this data on each of three Bureau of Labor Statistics (BLS) indices concerning other electronic devices, such as computers and electronic equipment, or component parts of handsets, such as semiconductors. At no point, however, did Economides introduce <u>any</u> independent variables into his analysis of the inflation of handset prices <u>vis a vis</u> the prices he predicted using the above-referenced BLS indices. In fact, Economides even testified that he "could not think of another explanation" for the inflation of handset prices other than the defendants' alleged tying and locking practices, which in turn allowed the carriers to impose

what he characterized as "unwanted features" on consumers, a characterization on which he did not elaborate.

The defendants point to two major developments that could potentially explain why the average wholesale price for wireless handsets exceed those for comparable consumer electronic products and/or their component parts: the shift from analog to digital technology and the related advances in handset features, including caller ID, email, and web browsers; and post-1999 improvements in handset quality, such as reduced size and weight, longer battery life, and greater spectral efficiency. Economides's failure to test for these obvious and significant alternative explanations renders Economides's analysis "essentially worthless." Tagatz v. Marquette Univ., 861 F.2d 1040, 1045 (7th Cir. 1988) (rejecting study that failed to control for variables for which one can control).

In addition, in his report, Economides explicitly states that his aim in performing his regression analysis was to determine "the effect, if any, of the tying and locking of handsets and services on the price for handsets sold in the United States." His resulting failure to consider "the varying business practices, and business results" of each defendant further strips his regression analysis of reliability, particularly given that the plaintiffs must prove that "each defendant's market power and tying arrangement had an

anticompetitive impact on the handset market." In re Wireless, 2003 WL 21912603, at *8. As a result, the regression analysis and the related portions of Economides's report must be excluded.

The plaintiffs do not defend the admissibility of Economides' analysis except to argue that the analysis should be admissible on the issue of damages, where they contend there is no legal requirement "to isolate and separately quantify" damages attributable to the various effects of defendants' alleged tying arrangements and contend.[34] Relying on New York v. Julius Nasso Concrete Corp., 202 F.3d 82 (2d Cir. 2000), they argue that in order to prove damages in an antitrust action, a plaintiff need only show "some relevant data from which the district court can make a reasonable estimated calculation of the harm suffered." Id. at 89. The Nasso case involved a claim of antitrust conspiracy and recognized that in such circumstances, there may be "a dearth of market information unaffected by the collusive action of the defendants." Id. at 88 (citation omitted). It is unnecessary to decide whether the Economides study would be admissible in proving damages in the context of a conspiracy

---

[34] Through a letter of May 31, 2005, the plaintiffs requested leave to file a sur-reply to the defendants' motion to exclude Economides's report, inter alia, on the ground that the defendants' reply "present[ed] new arguments that plaintiffs have not had a fair opportunity to respond to." Because no arguments raised for the first time in defendants' reply have been relied upon with respect to the admissibility of Economides's regression analysis, the request to file a sur-reply is denied.

claim.  It is inadmissible to prove the supposed anticompetitive effect from any one defendant's alleged tying practice.

Besides lack of proof, the plaintiffs' contention that the defendants' distribution practices have worked to inflate handset prices faces another insurmountable hurdle: it makes no economic sense.  Since the defendants do not manufacture handsets, and compete with each other through offering handsets with service, it is against each defendant's self-interest to discourage competition among handset manufacturers and thereby to allow handset manufacturers to enrich themselves at a defendant's expense.

Lastly, the plaintiffs claim that defendants' alleged tying arrangements have distorted the development of handset technology by stifling some innovations while needlessly imposing others on consumers.  On one hand, plaintiffs argue that as the "gatekeepers" of the handset market, defendants have impeded the development or incorporation of certain handset features, such as multi-carrier functionality, multiple SIM slots,[35] and Bluetooth technology.[36]  On the other hand, they contend that the defendants have blocked efforts by manufacturers to offer consumers simpler

---

[35] A handset with multiple SIM slots would allow a consumer to switch between carriers.

[36] The plaintiffs define Bluetooth technology as "short-range wireless computer connectivity."

handset models.  The plaintiffs have offered no admissible

evidence on the first point,[37] and limited, insufficient evidence

on the latter.

The plaintiffs principally rely on two documents from one

defendant, AT&T Wireless, regarding the alleged failure to offer

basic handsets.  In one undated document, AT&T Wireless observed

that a more simplistic handset model "drive[s] down costs,"

"provide[s] higher battery life" and is "less likely to have

performance problems resulting in fewer warranty return issues."

These observations prove nothing with respect to whether AT&T's

alleged tying arrangement has anticompetitive effects on the

handset market.  In the second document, dated February 17, 2004,

AT&T Wireless comments that approving very basic handset models

for use on its network may prevent it from driving technological

innovations in handsets and may enable manufacturers to offer

"features that enhance their brand yet may be detrimental to the

carrier's revenue strategy."  These two documents, taken

together, do not create a question of fact as to whether AT&T has

actually acted to stop manufacturers from offering simpler models

or alternatives to consumers, or more to the point, stifled

_____

[37] The plaintiffs' attempt to demonstrate, through
Economides's rebuttal report's citation to a January 2005 Wall
Street Journal article, that Verizon Wireless has suppressed the
introduction of Bluetooth technology, fails as well.  Even
assuming that the article were admissible, the plaintiffs have
not shown that such conduct by Verizon impacted the handset
market as a whole.

competition in the handset market.  Given the competition within

the wireless market, and AT&T's lack of market power, AT&T would

not, of course, have the ability to do so unilaterally.  In any

event, the issue is not whether a defendant has impaired the

distribution of a particular kind of product with its own service

but whether it has impaired competition among handset

manufacturers and within the handset market.  These documents do

not speak to that.

    With respect to their argument that the defendants have

"forced" certain handset features on "consumers who have no use

for them," the plaintiffs first contend that there is no consumer

demand for handset locks, citing Economides's report for the

proposition that "[s]ince handset locks have negative value to

the customer, there is no consumer demand for such a feature."

In coming to this conclusion, Economides relied on three

documents, which explain that the purpose of the locks is to

control churn.[38]

    The allegation that each of the defendants locks handsets

sold for use on its respective network is perhaps the heart of

---

[38] The first, from June 1995, contains an AirTouch
employee's analysis that handset locks "allow[] a carrier to
control churn."  The second, an undated AT&T Wireless document,
similarly explains that AT&T locks handsets to "make[] it costly
for the subscriber to switch to another carrier."  The third
document, a February 19, 2004 AT&T Wireless analysis, determines
that if customers could obtain unlocked handsets, they "could
replace the carrier without investment in a new device."

the plaintiffs' case.  The plaintiffs' principal concern is that

the locks impede consumers from switching readily between

carriers.[39]  Of course, the defendants have utilized other

practices to prevent churn too, such as one-year service

contracts.  As the statistics compiled by the FCC show, whatever

attempts the defendants have made to address churn, those efforts

have been to a significant degree futile.  Moreover, the

defendants' subsidization of handset costs, which they use to

lure new customers, undercuts the degree to which a locking

mechanism will dissuade a consumer from switching service

providers.[40]  In any event, and to reiterate, to show

---

[39] The plaintiffs alternately argue that the defendants'
tying arrangements allow them to lock handsets and that handset
locks serve, by inhibiting the availability of unlocked handsets,
to "reinforce the tie."  For the reasons discussed above, the
plaintiffs have not shown that a triable issue of fact exists as
to whether handset locking creates an anticompetitive effect.
The plaintiffs' second argument, that the defendants enforce
their respective tying arrangements by locking handsets, reveals
the fundamental deficiency of their tying claim.  A defendant
with market power in the tying product market needs no other aid
to implement a tying arrangement successfully; rather, by virtue
of its control over the tying product market, it is able to
diminish competition in the tied product market and force
consumers to accept a tying arrangement they would otherwise
resist.  The plaintiffs' argument, through their expert Robert
Zicker, that the defendants were not successful in tying until
locking was available underscores this basic point.

[40] As a matter of logic, the need for consumers to buy new
handsets when they switch plans should increase competition in
the handset market.  Defendants contend and plaintiffs do not
disagree that the defendants use their offers of handsets at the
lowest possible prices to compete with each other.  The increased
sales of handsets that result from this practice and the
incentive to use handset innovations as a draw to bring new

anticompetitive effects in the handset market from a defendant's practice of tying the sale of service to the purchase of a locked handset, the plaintiffs must show that an individual defendant's practice has injured a company competing in the handset market, created barriers to entry into that market, or otherwise injured competition in the tied product market.  They have not done so.

Finally, the plaintiffs argue that by virtue of their tying arrangements, the carriers have forced consumers to purchase handsets with data features, such as Internet browsers.  For this proposition, the plaintiffs first cite two AT&T Wireless documents, one from February 2004 that states that it "allows only data-capable devices" and another, undated document that includes an XHTML browser among AT&T Wireless's "unique specifications" for handsets.  The plaintiffs then contrast this information with a December 2003 report by Forrester Research that asserts that only 9 percent of wireless users report using a "branded data service" and declares that "[p]rice remains the most important purchase influencer for mobile subscribers, while new handset features and operator services generally leave users cold."

Even assuming that plaintiffs could show with admissible evidence that consumers as a whole do not want to purchase

---

customers to a new service provider foster competition in the tied product market.

handsets with data features, the plaintiffs' focus on these features as evidence of "reduced consumer choice adversely affecting the qualities of handsets available in the marketplace" is misguided. The plaintiffs have offered no legal support for the proposition that too much product innovation, as opposed to diminished quality, can show the actual adverse effect on competition needed to prevail under a rule of reason analysis. Just as significantly, the plaintiffs have presented no evidence as to how the inclusion of these features has created barriers to competition among handset manufacturers or in the handset market. For all of these reasons, defendants are also entitled to summary judgment on the plaintiffs' contention that each defendant's alleged tying arrangement has had an anticompetitive effect on the market for handsets in the United States.

## Conclusion

For the reasons stated above, the defendants' motion for summary judgment is granted.  The Clerk of Court shall close the following cases: 02 Civ. 2637 (DLC), 03 Civ. 1712 (DLC), 03 Civ. 1713 (DLC), 03 Civ. 1714 (DLC), and 03 Civ. 1715 (DLC).[41]


SO ORDERED:

Dated:    New York, New York
          September 2, 2005


_____
          DENISE COTE
     United States District Judge

---

[41] The parties have been ordered to file in the public record the bulk of their motion papers, which they initially filed under seal.  The Court retains jurisdiction over that unsealing process.